IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **QUEEN VIRGIN REMY LTD. CO.,** **QUEEN VIRGIN REMY COLUMBUS, LLC**, and **DENNIS McKINLEY**, individually, | : : : : | |
| Plaintiffs, | : : | |
| and | : : | CIVIL ACTION FILE |
| **DENNIS McKINLEY**, Individually, | : | NO. 1:15-CV-1638-SCJ |
| Plaintiff and Counter-Defendant | : : | |
| v. | : : | |
| **SHANISE W. THOMASON**, | : : | |
| Defendant and Counter-Plaintiff. | : : | |

## <u>ORDER</u>

This matter is before the Court on Plaintiffs' motion for order to show cause why Defendant Thomason should not be held in contempt [75]; Plaintiffs' motion for temporary restraining order and request for preliminary injunction [76]; Plaintiffs' motion to dismiss Defendant's amended counterclaim [84]; Plaintiffs' motion for leave to file matters under seal [121]; Plaintiffs' motion for partial summary judgment [122]; Defendant's motion for summary judgment [123]; Defendant's motion for leave to file materials under seal [127]; Plaintiffs' motion for

leave to file matters under seal [135]; Plaintiffs' motion to strike Defendant's theory of defense [147]; Plaintiffs' motion for leave to file material sunder seal [148]; Plaintiffs' motion for leave to file material under seal [149]; Plaintiffs' motion to amend citations [154]; Plaintiffs' motion for attorney's fees [159]; Plaintiffs' motion for leave to file material under seal [160]; and Plaintiffs' unopposed motion for extension of time to file reply [169].

I.   **Background**

    A.   **Procedural History and Facts**

Plaintiffs, Queen Virgin Remy Ltd., Co., Queen Virgin Remy Columbus, LLC, and Dennis McKinley, filed suit against Defendant, Shanise Thomason, on May 8, 2015.  Plaintiffs sought injunctive relief from the Court on their trademark claims associated with the phrase "Queen Virgin Remy" and the "Queen Virgin Remy" brand logo.  The Court held evidentiary hearings on May 18, 2015, and June 8, 2015.  On June 10, 2015, the Court entered an order granting Plaintiffs' motion for temporary restraining order and preliminary injunction.  <u>See</u> Doc. No. [14].  Thomason raised counterclaims of breach of contract, promissory estoppel, fraud, and breach of fiduciary duty.  In an order dated December 7, 2015, the Court granted in part and denied in part Plaintiffs' motion to dismiss Thomason's counterclaims.  <u>See</u> Doc. No. [68].  Thomason filed an Amended Counterclaim.  <u>See</u>

AO 72A
(Rev.8/82)

Doc. No. [77].  The parties engaged in discovery and the Court has addressed various discovery and other pre-trial motions.  The parties' cross-motions for summary judgment are fully briefed and before the Court.

At the time Plaintiffs filed their complaint, the Queen Virgin Remy ("QVR") business included eleven retails store locations across the country as well as a website presence.  See PSMUF, ¶ 1.  QVR sells premium hair products to individual buyers, salon chains, cosmetic/beauty distributors, and retailers.  Id., ¶ 2.  McKinley began selling hair under the name Queen Virgin Remy Hair as early as 2011.  Id. McKinley and Thomason met in the summer of 2012 when Thomason found McKinley's advertisement on Craigslist for the sale of hair.  Id., ¶ 3.  Thomason re-sold the QVR hair on her website EgoXtensions.com and also used it when styling her customers' hair.  Id., ¶ 4.  Sometime in summer or late 2012, Thomason and McKinley began a personal relationship.  Id., ¶ 5 & Resp.  On August 19, 2012, McKinley registered Queen Virgin Remy Ltd. Co. with the Georgia Secretary of State.  See DSMUF, ¶ 4.

McKinley and Thomason discussed the idea of opening a storefront in Atlanta where McKinley would sell hair and Thomason would style hair.  See PSMUF, ¶ 5 & Resp.; see also PSMUF, ¶ 2 & Resp.  They looked at potential stores. See PSMUF, ¶ 2.  Thomason opened a salon called EgoXtensions in the fall of 2012.

See Thomason Depo. Vol. I, at 93.  Thomason testified that she styled hair at the salon and McKinley provided the hair either directly to customers at EgoXtensions or directly to Thomason.  Id. at 93-95.  Sometimes the customers would pay McKinley directly for the hair.  Id. at 93.  She further testified that McKinley handled the books at EgoXtensions.  Id. at 94.  A lease document exists for EgoXtensions. Id. at 95 (citing Ex. M-5).  The date of the lease is September 18, 2012, and it is in the name of an entity called Hair Remy LLC.  Id.  McKinley's name does not appear on the lease.  Id. at 96.  Thomason testified that McKinley hired the five independent contractors who worked at the EgoXtension salon.  Id. at 98-99. Thomason retained payments customers made for the purposes of styling the hair. Id. at 103.

In November 2012, McKinley executed a lease for a Queen Virgin Remy store in the Edgewood shopping complex.  See PSMUF, ¶ 11.  The Edgewood store opened around December 2012 or January 2013.  Id., ¶ 12 (citing Doc. No. [44], at pp. 71-72).  Thomason was not a party to the Queen Virgin Remy Edgewood lease. Id., ¶ 13.  Kay Goldstein, landlord for Edgewood, testified that she never had any interaction with Thomason during the negotiation of the lease or thereafter.  See id., ¶ 14.  Thomason testified that although she was not on the lease, she did interact with Ms. Goldstein.  Id., Resp. ¶ 14 (citing Thomason Decl., ¶ 19).

Thomason and McKinley went to the City of Atlanta business license office together. McKinley sought a license for Queen Virgin Remy while Thomason got a license for EgoXtensions. <u>Id.</u>, ¶ 15. Neither was named on the license of the other. <u>Id.</u> During this time, Thomason also operated a separate salon called The Weave Spot in Columbus, Georgia. <u>Id.</u>, ¶ 18. The money Thomason acquired from The Weave Spot is kept separate from money from Queen Virgin Remy. <u>Id.</u>, ¶ 20 & Resp.

In August or of the fall of 2012, McKinley and Thomason rented a one-bedroom apartment together in a complex known as Montage. <u>Id.</u>, ¶ 23 & Resp. The lease for this apartment was signed on September 13, 2012. <u>See id.</u>, ¶ 24 (citing McKinley Decl., Ex. C). They moved to a "live work" space at the same apartment complex in January 2013. <u>See</u> McKinley Depo., at 83-84.

Thomason and McKinley continued to engage in a personal relationship through 2013 and into early 2014. <u>See</u> PSMUF, ¶ 29 & Resp. Thomason testified that she never trusted McKinley in their personal relationship, but did trust him in their business relationship until she discovered that "he was transferring money and doing some fraudulent things" without her knowledge. <u>Id.</u>, ¶ 30 (citing Thomason Depo., at 79). The lease on the larger work-space apartment ended in July 2013. <u>Id.</u>, ¶ 34. McKinley and his brother rented another apartment. <u>Id.</u>, ¶ 35.

5

Thomason moved in with them.  Id., ¶ 36.  McKinley then rented an apartment in Atlantic Station.  Id., ¶ 37.  Thomason told McKinley she would only stay there temporarily until she found a place to live.  Id., ¶ 38.  McKinley testified that he had to take legal action to remove Thomason from the apartment.  Id.  In general terms, the parties' business relationship deteriorated at the same time as their personal relationship did.  The deterioration led to the instant litigation.

## B.   Contentions

In their motion for partial summary judgment, Plaintiffs allege that Thomason does not have any evidence to corroborate her claim that she and McKinley were 50-50 partners in the Queen Virgin Remy enterprise.  Because she cannot sufficiently allege a partnership, Plaintiffs aver, Thomason cannot succeed on her claims of breach of oral contract, breach of fiduciary duty, and fraud. Plaintiffs further argue that Thomason has no defense to Plaintiffs' claims of trademark infringement, unfair trade practices, and conversion.  Plaintiffs ask for their claim of damages and attorney's fees to be resolved at trial.[1]

Defendant responds that she and McKinley reached an oral agreement to be partners in Queen Virgin Remy.  Because they were 50-50 partners in the business,

---

[1]The Court **GRANTS** Plaintiffs' motion for leave to correct citations in their statement of material facts [154].  The Court considers amended Plaintiffs' statement at Docket Entry [154] and Defendant's response to those statements at Docket Entry [167].

Thomason contends, she had full authorization to use the intellectual property of Queen Virgin Remy, and thus, Plaintiffs' trademark infringement claims fail.  She also argues that Plaintiffs are liable for fraud and breach of fiduciary duty because McKinley did not fulfill the promises he made to Thomason in return for her financial investment and work at the Queen Virgin Remy salons.  Thomason avers that Plaintiffs' claim for conversion fails because McKinley gave her permission to use hair from the Queen Virgin Remy salon in Columbus for a trade show.  Finally Thomason argues that McKinley's defamation claim is without merit because the statements she made were true and protected by her legitimate interest in the Queen Virgin Remy business.

## II.    Discussion

### A.    Preliminary Matters and Discovery

Several pending motions have been overtaken by the parties' cross-motions for summary judgment.  As such, the Court **DENIES AS MOOT** Plaintiffs' motion for order to show cause why Defendant Thomason should not be held in contempt [75]; **DENIES AS MOOT** Plaintiffs' motion for temporary restraining order and request for preliminary injunction [76]; and **DENIES AS MOOT** Plaintiffs' motion to dismiss Defendant's amended counterclaim [84].[2]

---

[2]To the extent any further discussion is required, in their motion for contempt, Plaintiffs generally allege that Thomason violated the Court's injunction

AO 72A
(Rev.8/82)

The parties have also filed several motions to file material under seal. Because these motions are so voluminous, the Court determines the best course of action is to discuss and rely on the information pertinent to the relevant legal questions before the Court, such as whether McKinley and Thomason reached an oral agreement to form a partnership regardless of whether the parties intended to have that material sealed.  As the Court of Appeals discussed in Romero v. Drummond Co., 480 F.3d 1234 (11th Cir. 2007), the "operations of the courts and the judicial conduct of judges are matters of utmost public concern," id. at 1245 (citing Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978)), and "[t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." Id. (citing Chicago Tribune  Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2000)). This right "includes the right to inspect and copy public records and documents." Id. (citation omitted).

---

order (Doc. No. [14]) by forming an entity called Royal Virgin Remy with a name and logo similar to that of Queen Virgin Remy.  The Court disagrees.  The Court's June 10, 2015 order bars Thomason from any unauthorized use of the Queen Virgin Remy mark.  While the Court decides below that Thomason's Royal Virgin Remy infringes on the Queen Virgin Remy mark, that is a different question from whether it is an unauthorized use of the Queen Virgin Remy name and mark.  As such, the Court finds that Thomason's use of Royal Virgin Remy does not come within the scope of the Court's June 10, 2015, injunctive order, and cannot form the basis for contempt.

8

It appears to the Court that the reason behind much of the requests to seal documents is to protect the details of a third-party contract made by Toya Wright with Queen Virgin Remy and to limit the disclosure of some of the more salacious details of the failed personal relationship between Thomason and McKinley. The Court does not find these details relevant to the legal dispute between the parties and did not refer to these details in ruling on the parties' cross-motions for summary judgment.

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file matters under seal [121]; **GRANTS IN PART AND DENIES IN PART** Defendant's motion for leave to file materials under deal [127]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file matters under seal [135]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file materials under seal [148]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file material under seal [149]; and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file material under seal [160].

Finally, during a discovery hearing on May 17, 2016, the Court made several rulings in an attempt to bring discovery matters to a close. The Court also permitted Defendant to file a brief arguing why she should be able to raise issues

with respect to alleged failures of Plaintiffs to adequately respond to her discovery requests.  See Order, Docket Entry [145], at 3.  In her supplemental brief, Defendant contends that she served her discovery requests less than one month into the discovery period and the parties were conferring in good faith about Plaintiffs' discovery responses at the time the discovery period ended.  See Doc. No. [155].

Defendant admits the chronology of facts that led the Court to its initial ruling that Defendant raised her concerns about Plaintiffs' product **after** the close of discovery.  On the last day of discovery, Plaintiffs' counsel contacted the Court to notify it of a discovery dispute in accordance with the Court's Case Instructions.[3]  The Court instructed Defendant to respond to Plaintiffs' concerns.  Included in that response – filed after the close of discovery – were both Defendant's response to Plaintiffs' concerns, as well as Defendant's own complaints as to Plaintiffs' discovery production.  At no time prior to its response did Defendant indicate to the Court that it sought assistance with a discovery dispute.  Defendant's January 26, 2016, email states only that the parties were in the process of conferring.  Defendant's supplemental brief does not address the untimeliness of her request for

---

[3]This notification serves the function of a filing of a motion to compel and initiates a discovery dispute resolution mechanism the Court favors as more efficient and timely than a motion to compel.

AO 72A
(Rev.8/82)

the Court to address Plaintiffs' alleged deficient response, but rather only addresses the merits of why Defendant seeks this material.

As such, for the same reasons as it articulated during the discovery conference, the Court declines to order any additional production from Plaintiffs. Defendant was on notice of the parties' disagreements as to the adequacy of Plaintiffs' response.  The Court recognizes that Defendant was engaging with Plaintiffs in a good faith effort to resolve these issues.  But once the last day of discovery arrives, Defendant faces a deadline and must contact the Court – as Plaintiffs did – to notify it of the on-going dispute.  The Court does not find that its ruling discourages good faith conferral but rather that its ruling preserves the importance of discovery deadlines.

Although it stated that it had not yet determined whether to grant Plaintiffs' request for attorney's fees, the Court also directed Plaintiffs to file an attorney's fee petition regarding time expended to move the Court to order Thomason to fully comply with Plaintiffs' discovery requests. See Doc. No. [145].  Plaintiffs have done so.  See Doc. No. [159].  However, Plaintiffs' filing contains only a heavily redacted exhibit of billing records.  Plaintiffs have not made any attempt to even provide the Court with a total amount of attorney's fees requested.  Nor have they offered any information that would enable the Court to undertake the analysis required under

11

Norman v. Housing Authority, 836 F.2d 1292 (11th Cir. 1988) and ACLU v. Barnes, 168 F.3d 423 (11th Cir. 1999).  As such, the Court **DENIES** Plaintiffs' motion for attorney's fees [159].

### B.    Summary Judgment Standard

The parties have filed cross-motions for summary judgment.  The Court has considered all statements of fact and responses as well as the parties' briefs on all matters.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party's burden is discharged merely by "'showing' — that is, pointing out

12

to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the nonmoving party has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). Nevertheless, all reasonable doubts are resolved in favor of the nonmoving party. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

### C.    Partnership Agreement

From its inception, it has always been clear that the crux of this case is whether McKinley and Thomason ever formed a partnership.[4]   During her

---

[4]Plaintiffs note in their motion for partial summary judgment that Thomason's claims of breach of contract (Counterclaim 1), promissory estoppel (Counterclaim 2), Fraud (Counterclaim 3), and breach of fiduciary duty (Counterclaim 4), as well as Thomason's Seventh, Fourteenth, and Fifteenth affirmative defenses, and her defense to Plaintiffs' conversion (Count 1) and intellectual property claims (Counts 2-8) rely on the viability of her partnership

13

deposition, Thomason was extensively questioned on the basis for her claim that she and McKinley had formed a partnership.  Given the importance of this testimony, the Court quotes extensively from her deposition.

> Q:   Do you understand that you contend that you had a three-year agreement with McKinley?
>
> A:   Yes, three-year agreement that we was going to be in business for three years and maybe sell the store, sell the business.
>
> Q:   When did that agreement start?
>
> A:   When we first opened up Edgewood.

See Thomason Depo., at 105.

> Q:   What was the date that you formed the partnership?
>
> A:   I don't remember the date that we formed the partnership, but when we decided to open up a store, we had an agreement.
>
> Q:   What were the terms of the agreement?
>
> A:   The terms that we were going to open up a store, it was going to last maybe three years, maybe five, but three years, and then we were going to build it and then sell it.  Open up a warehouse, open up more stores and just make it successful, and then sell it.
>
> Q    Those were all the terms?
>
> A:   We were going to open up a warehouse. I mean maybe franchise, I can't remember exactly.  But to my recollection, we was going to open up a hair company and then open up retail

_____

contention.

14

stores, see how it's going to work for three years.  And if it's successful or not, we're going to go our separate ways if not. And then if it was successful, we was going to sell it.

. . .

Q:      . . . What exactly are the promises that you contend McKinley made?

A:      One promise was that we were going to continue to be fifty-fifty business partners, but that wasn't true.

. . .

Q:      What other promises?

A:      That I was going to get 20 percent of after profits from Toya and I never received that either.

. . .

Q:      Any other promises?

A:      I mean that every store was mine, and we opened up a store; I was going to get paid for doing work.  That we were going to split the profits.  It was so many promises. I can't remember every one, but there were so many.

Id. at 107-09.  Thomason later testified:

Q:      So by the time you moved in together at the Montage you had a partnership?

A:      Yes.

Q:      Were all the terms of the partnership formed at the time you moved into the Montage?

A:    Not all the terms because we hadn't even opened a store yet or even -- you know, everything wasn't formed yet.  I mean we spent time together. So as we spent time together and discussed what we were going to do with the business, we -- I mean we discussed the terms of the partnership. But it wasn't just one specific day or when we moved into Montage this is what's going to happen on down the line, no.

Q:    When you moved into the Montage, what were the terms of the partnership that were existing at the time you moved into the Montage?

A:    That we were going to be fifty-fifty partners and we was going to open up a store. That's -- I mean that's what he presented to me and that's -- I mean I didn't -- all I knew, you know, that I wanted to open up a store.  But I knew, you know, it was my idea to open up a warehouse.  I mean he didn't have that idea to open up other stores. All he was focused on was that one location in Atlanta.

Q:    Was there ever a discussion about having a shared spot between the retail and a salon all in the same store?

A:    Yeah, we did have that discussion.

Id. at 236-37.  This testimony is consistent with the testimony provided by Thomason at the hearing on Plaintiffs' motion for preliminary injunction.  There, Thomason stated:

Q:    Now, did Mr. McKinley approach you at some point about going into business with him?

A:    Yes. He had first asked me if I wanted to open up a store front because I was his like largest wholesaler, so he asked me did I want to go into business, you know, he was trustworthy so I said yes.

16

Q:   Did y'all have discussions about how you might want to proceed with such a business?

A:   Yes. We discussed about if I would be, you know, the hair person, you know, just handle all the aspects of the business and he would handle like the paperwork and stuff like that.

Q:   What about any discussions about how you might grow the business?

A:   Yes. We would open up, you know, first he would look for a store front because I wasn't familiar to Atlanta, I would just meet at a certain place and get hair from him. So, he would look for a building and then I, you know, will come up, you know, do the hair.

Q:   Did you and Mr. McKinley ever discuss what you each would contribute to the business?

A:   I would contribute my contacts in hair business and he would contribute like all the business aspects and I would contribute my money.

Q:   Can you just summarize what was your agreement with Mr. McKinley to go into business together?

A:   He told me if I gave him 20,000 up front and then like up to $5,000 a week he would find a building. And, you know, we would open up stores in different cities, you know, around the country and eventually a warehouse.

Q:   And did all of those things take place?

A:   Yes.

. . .

Q:     Did you and he have any agreement as to once y'all agreed to go
       into business together, did you ever address how the hair was
       to be named and how it was to be sold?

A:     Yes. We merged the two together because we had opened up a
       salon in Buckhead, so it was hard for me to, you know, manage
       all of it, you know, and I was going out of town twice a week
       because I was still a stylist and he handled all of the business.
       So, we merged them together because I couldn't do my packing
       and orders and so he was doing that. And Chiya-Doll, Chiya, I
       call her Chiya-Doll, but Techiya, she was handling all of that,
       too.

Id. at 59-61.  During that hearing, Thomason also testified that McKinley never told

her "how he was going to organize your business with him." Id. at 66.  During a

colloquy with the Court, Thomason testified:

THE WITNESS: I mean, no, because he just asked me for 20,000 up
front and pay him 5,000 a week.

THE COURT: For how many weeks?

THE WITNESS: Until the business got rolling because he didn't have
the money for the initial start-up.

Id. at 97.  She continued on cross-examination:

Q:     So, my question was so the commitment to make the five
       thousand -- the weekly five thousand dollar payment was
       indefinite until such time when Mr. McKinley decided he didn't
       need the money anymore?

A:     Until the business got going, he handled the business aspect. I
       trusted him, I believe what he said, so, I just gave him the
       money.

18

Q:     There wasn't any agreement as to how long those weekly payments should last, was there?

A:     No, because he told me what money comes in has to go out, so I trusted him. I mean, there was no reason I shouldn't have trust him. He never ran with my money. I believed everything he said.

Id. at 97-98.

In response to Plaintiffs' motion for summary judgment, Thomason filed a lengthy declaration.  Plaintiffs have filed numerous objections to this declaration. The majority of objections are based on Plaintiffs' view that the testimony in the declaration is "self-serving" or "conclusory."  See Doc. No. [153].  While there are some instances in which such objections might be well-taken,[5] this is not one of them.  Much of this case comes down to a disagreement between Thomason and McKinley concerning what happened in their relationship.  As such, testimony from both Thomason and McKinley about these events to some extent will be "self-serving" or "conclusory."  In most circumstances, the testimony will relate to what was said between the two and there will not be any directly contradictory documentary evidence to support either side.  As such, the Court will not strike any

_____

[5] See, e.g., Wallace v. Teledyne Continental Motors, 138 F. App'x 139, 132 (11th Cir. 2005) (conclusory and subjective opinion of plaintiff that she was eligible for license not sufficient to raise inference of pretext); Early v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (conclusory, self-serving, or uncorroborated allegations in affidavit could not create issue of fact sufficient to defeat well-supported summary judgment).

AO 72A
(Rev.8/82)

Case 1:15-cv-01638-SCJ   Document 176   Filed 08/11/16   Page 20 of 62


portion of Thomason's declaratory on the basis of it being "self-serving" or "conclusory."

Plaintiffs, however, do object to Paragraph 7 of Thomason's declaration as directly contradicting Thomason's deposition testimony.  Plaintiffs contend, therefore, that the Court should strike Paragraph 7 as "sham."  The Eleventh Circuit has addressed "sham" affidavits in Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc., 73 F.2d 656 (11th Cir. 1984).  There, in a dispute about a construction agreement, the plaintiff had clearly stated three times in his deposition that the contract for him to purchase the building contained no conditions, and that the contract had to be approved by certain individuals. In an affidavit filed after his deposition was taken, however, the plaintiff testified that he was told approval was only a formality and that as soon as the contract was signed, he would receive a dealership for the construction company. The court agreed with the district court that the plaintiff's affidavit was a sham. Id. at 657. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation,  previously given clear testimony." Id.

20

(Rev.8/82)

Thus, the court may disregard an affidavit as "'sham' if it flatly contradicts earlier deposition testimony without valid explanation." <u>See</u>, <u>e.g.</u>, <u>Faulk v. Volunteers of America</u>, 444 F. App'x 316, 318 (11th Cir. 2011). "But the court must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" <u>Id.</u> (quoting <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 953 (11th Cir. 1986)). To be "sham," the affidavit testimony must clearly contradict previous testimony. <u>See</u> <u>Tippens</u>, 805 F.2d at 954 (noting that statement needs to be more than just "at odds" with previous testimony, it must be "inherently inconsistent" and "create an irreconcilable conflict").

The Court finds Plaintiffs' <u>Van T. Junkins</u> objection has merit and given the importance of Paragraph 7 to the entirety of this case, it warrants more extended discussion than Plaintiffs' other objections. In Paragraph 7 of her declaration filed after Plaintiffs moved for summary judgment, Thomason testifies:

> McKinley and I agreed to become partners in the Queen Virgin Remy business in the summer of 2012. Our agreement was as follows:
>
> - I would provide monies in an amount up to $100,000.00 as start-up capital needed until our partnership experienced positive cash-flow;
>
> - I would use my industry contacts to market, promote and grow the business;

21

- McKinley would provide his sources for obtaining hair;

- As equal fifty percent (50%) owners, we would share profits and losses; equally;

- McKinley would be responsible for the legal organization of the business and for the business' finances;

- McKinley would organize the business consistent with each of us being fifty percent (50%) owners;

- Our business would use the "Queen Virgin Remy" name for product sales and would focus its initial efforts on online sales;

- The business would open an Atlanta storefront retail location within six (6) months of their agreement with McKinley to be responsible for scouting their Atlanta location;

- The business would look to open a distribution warehouse and stores in other cities after the Atlanta location was up and running, with each such store to also be owned by me and McKinley jointly as fifty-fifty partners;

- Other property related to Queen Virgin Remy would be owned by our business;

- We would jointly make decisions about the business operations;

- Profits from our business would be reinvested into the business in order to grow it; and

22

- Our joint fifty-fifty ownership in any Queen Virgin Remy business would last for approximately three (3) years, as our business plan was that the entire business should have grown sufficiently to allow us to sell the business and realize a large pay out.

See Thomason Decl., ¶ 7.

The Court finds that Thomason's declaration is inconsistent in material ways with her testimony at the hearing on Plaintiffs' motion for a temporary restraining order and her deposition testimony in that Paragraph 7 alleges more specific and extensive agreements with respect to the partnership than Thomason previously disclosed. Important to the Court's determination that this testimony contradicts Thomason's previous testimony is the context of this case. From the outset, this case has primarily concerned whether Thomason and McKinley formed a partnership. This matter has been addressed at every substantive hearing held by the Court and in every deposition taken by the parties. Thomason was deposed at great length on this topic. She had every opportunity at the time of her deposition to testify as to what she believed the terms of the partnership to be.

For this reason, her declaration filed after the close of discovery and in response to Plaintiffs' motion for summary judgment cannot now – without any explanation at all – raise additional details of the partnership agreement such as the fact that Thomason would provide up to $100,000 in capital, the business would use

23

the "Queen Virgin Remy" name for product sales, they would share profits and losses equally, the business would look to open a distribution warehouse and stores in other cities after the Atlanta location was up and running, with each such store to also be owned by Thomason and McKinley jointly as fifty-fifty partners, other property related to Queen Virgin Remy would be owned by the business, they would jointly make decisions about the business operations, and profits from the business would be reinvested into the business in order to grow.  These are all new allegations.

Discovery is closed. In her deposition, Thomason clearly testified that she could not say when any partnership was reached between the two, they had different visions of whether there would be multiple locations and warehouses, and there was no clear time frame when Thomason would stop making payments of $5,000 per week.  Thomason's deposition testimony clearly states that she saw McKinley as in charge of the business and she was "taking whatever he said." Thomason simply cannot be permitted to add elaborate additional detail about the alleged partnership at this stage in the litigation, particularly when she has not explained why she was unable to provide this additional testimony earlier.  The Court finds Paragraph 7 is "sham" under Van T. Junkins and will not consider it. The Court will refer to Thomason's testimony in hearings before the Court and her deposition to consider whether there is sufficient information in the record to create

a material dispute of fact as to whether Thomason and McKinley ever formed a partnership.

Because the Court addressed the partnership contention when ruling on Plaintiffs' first motion to dismiss Defendant's counterclaims, the Court draws heavily on its previous analysis.  Under Georgia law, a

> partnership is an association of two or more persons to carry on as co-owners a business for profit. . . .  Factors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital.  But the intention of the parties is the true test of whether there is a partnership, which may be created by a contract.

Aaron Rents, Inc. v. Fourteenth Street Venture, L.P., 243 Ga. App. 746, 747-48, 533 S.E.2d 759, 761 (2000).

Georgia does recognize oral partnership agreements. See, e.g., East Piedmont 120 Associates v. Sheppard, 209 Ga. App. 664, 665, 434 S.E.2d 101, 102 (1993); Vitner v. Funk, 182 Ga. App. 39, 42-43, 354 S.E.2d 666, 670 (1987).  However, the

> first requirement of the law relative to contracts it that there must be a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. A contract cannot be enforced in any form of action if its terms are incomplete or incomprehensible.

Bagwell-Hughes, Inc. v. McConnell, 224 Ga. 659, 661-62, 164 S.E.2d 229 (1968).

In <u>Lemming v. Morgan</u>, 228 Ga. App. 763, 492 S.E.2d 742 (1997), the court considered a breach of oral partnership claim where the defendant allegedly agreed that he would transfer one-half interest in property to the plaintiff and split proceeds in exchange for the use of the plaintiff's expertise and skills in developing and reselling the property.  The court found that the oral partnership agreement was too uncertain and indefinite because it failed to provide:

> when transfer of title, division of proceeds, or sale of the properties was to take place; how or when development was to take place on any of the properties; how development or other costs of the ventures were to be allocated; how, when or by whom it would be decided whether the properties would be sold or whether one-half of [defendant's] interests in the various properties would be transferred to [plaintiff]; or how proceeds would be calculated.

<u>Id.</u> at 764-765. The court noted the fact that plaintiff "may have performed his obligations under the purported agreement does not require a different outcome. Although in some contexts performance may supply the definiteness required for an enforceable contract, in this case it does not.  The deficiencies here were not cured by performance because the agreement relied upon was so vague, indefinite and uncertain as to make it impossible for courts to determine what, if anything, was agreed upon, therefore rendering it impossible to determine whether there had been performance." <u>Id.</u> at 765.  "It has not been shown, with any reasonable certainty, what the parties were obligating themselves to do.  <u>Id.</u>

26

The court reached a similar conclusion in <u>Burns v. Dees</u>, 252 Ga. App. 598, 557 S.E.2d 32 (2001), where the oral partnership agreement did not provide when the sale of the company would take place, did not allocate how the property and other costs would be allocated, did not discuss each party's obligations in the event of losses, did not discuss how profits would be calculated. <u>Id.</u> at 602-04. The court found that because the plaintiff's promissory estoppel and fraud claims were also based on the alleged contract, those claims also failed because the court determined that the underlying contract was unenforceable. <u>Id.</u> at 606-07; <u>see</u> <u>also</u> <u>Wnuk v. Doyle</u>, 276 Ga. App. 550, 623 S.E.2d 740 (2005) (where parties did not discuss how much partner would need to pay for 50 percent partnership interest, alleged verbal agreement too indefinite to be enforced); <u>Massih v. Mulling</u>, 271 Ga. App. 685, 687, 610 S.E.2d 657 (2005) (holding that oral agreement for 20 percent ownership in company too indefinite where details about ownership were never resolved, including how plaintiff would receive ownership and how company would be structured).

Here, Thomason testified that she did not remember the date she and McKinley formed the partnership and that the discussions occurred more on a rolling and on-going basis. <u>See</u> Thomason Depo., at 107. She stated that the terms of the agreement were "to open up a store, it was going to last maybe three years, maybe five, but three years, and then we were going to built it and then sell it.

Open up a warehouse, open up more stores and just make it successful, and then sell it." Id. "We were going to open up a warehouse. I mean maybe franchise, I can't remember exactly. But to my recollection, we was going to open a hair company and then open retails stores, see how it's going to work for three years." Id. "We discussed about if I would be, you know, the hair person, you know, just handle all the aspects of the business and he would handle like the paperwork and stuff like that." See Doc. No. [120], TRO Hearing Trans. at 59. "He told me if I gave him $20,000 up front and then like up to $5,000 a week he would find a building. And, you know, he would open up stores in different cities, you know, around the country and eventually a warehouse." Id. at 60. Thomason testified that there was not an agreement for a specific amount of money she would contribute to the partnership. Id. at 97-98.

By September 2012, Thomason stated, she and McKinley had agreed to be "fifty-fifty partners and we was going to open up a store." See Thomason Depo., at 237. "That's — I mean that's what he presented to me and that's – I mean I didn't – all I knew, you know, that I wanted to open up a store. But I knew, you know, it was my idea to open up a warehouse. I mean he didn't have that idea to open up other stores. All he was focused on was that one location in Atlanta." Id. She stated they did not agree to include a warehouse or to open up any other stores in this alleged partnership. Id. The terms of the partnership were not finalized before

28

September 2012. Id. at 236.  Although the parties had discussed opening a store for retail hair sales and styling services, Thomason opened EgoXtensions herself.  Id. at 237 and 101-02. She stated "it wasn't – we – everything with us was oral.  I mean, we didn't write down let's get this together.  *I mean, I only knew what he told me. I was going by what he said.*"  Id. at 239 (emphasis added).

The Court finds there simply is not sufficient information in the record for a reasonable jury to conclude that Thomason and McKinley reached an agreement on forming a partnership.  Thomason's testimony is vague and uncertain and in particular does not show any kind of meeting of the minds.  Significantly, she, herself, states that McKinley did not see the strategy for the business in the same way that she did and that she was only doing what he told her to do.  Thomason argues that at the commencement of the partnership, the business enterprise was not so sophisticated so any agreement Thomason and McKinley would have reached would not be detailed or extensive.  See Doc. No. [141], at pp. 14-15.  But there still has to be evidence from which a reasonable jury could conclude that there had been a meeting of the minds and agreement to enter into a partnership together.  This is what the Court finds lacking.[6]

---

[6]The Court is also not persuaded by Thomason's citation to Floyd v. Kicklighter, 139 Ga. 133, 76 S.E. 1011 (1912).  Floyd involved an agreement to form a partnership to purchase land.  That is a very different undertaking than an alleged agreement to form a partnership to run an on-going business.

29

The majority of Thomason's response to Plaintiffs' motion for summary judgment on the partnership claim deals with cases considering whether any kind of partnership was implied in the parties' behavior.  Thomason relies to a great extent on Ghee v. Kimsey, 179 Ga. App. 446, 346 S.E.2d 888 (1986).  Ghee addressed whether the plaintiff had proffered sufficient evidence of an implied partnership, not an oral partnership agreement as Thomason alleges here.  But Thomason has never alleged an implied partnership; she has always alleged that the parties reached an oral agreement to form a partnership.  That is not a distinction without a difference.  The evidence that goes to support an alleged oral agreement is very different than the evidence surrounding an alleged implied partnership.  An oral agreement depends on the words exchanged between the parties while an implied partnership considers the actions taken by the parties.  The Court finds that the parties would have engaged in a different type of discovery had the allegation been an implied partnership, as opposed to a theory which Thomason has propounded throughout the litigation – that she and McKinley had an oral agreement to be partners.  See, e.g., Accolades Apartments, L.P. v. Fulton County, 279 Ga. 257, 612 S.E.2d 284 (2005) (rejecting reliance on O.C.G.A. § 14-8-7 partnership in absence of express agreement because "[w]here parties 'distinctly agree among themselves to become partners, there is no reason why the law should not take them at their word, even though [an] agreement falls short of the facts from which the law would

otherwise have inferred a partnership'") (quoting <u>Huggins v. Huggins</u>, 117 Ga. 151, 156, 43 S.E. 759 (1903)); <u>see</u> <u>also</u> <u>Waugh v. Waugh</u>, 265 Ga. App. 799, 901, 595 S.E.2d 647 (2004) ("A partnership results from contract, <u>either</u> express or implied.") (emphasis added).  The Court will not permit Thomason to proffer a new theory of liability at this stage of the litigation.  As a result, Thomason's references to isolated circumstances under which McKinley referred to Thomason as a "partner"[7] are not sufficient to show that McKinley and Thomason reached an agreement as to terms and conditions of a partnership between the two of them.

The Court's finding that no reasonable jury could determine that Thomason and McKinley formed a partnership has implications for many of the claims in this litigation.  As the Court found in its order on Plaintiffs' motion to dismiss counterclaims, Thomason's promissory estoppel claim also fails because the statements she alleges to support her claim are too vague and indefinite to form the basis of a promissory estoppel claim.  <u>See</u> Doc. No. [68], at p. 12.

---

[7]Thomason contends that on November 3, 2012, McKinley sent a text to a vendor which stated: "My Name is McKinley I'm a principal at QueenVirginRemy you spoke to one of my partners Shanise T over at EgoXtensions.  We were trying to meet last week to discuss PR."  <u>See</u> Doc. No. [162], Resp. PSMUF, ¶ 51.  She also stated that McKinley did not object when Thomason referred to them as partners in the presence of Queen Virgin Remy employees and third parties in late 2012 and early 2013.  <u>See</u> <u>id.</u>  Finally, Thomason states that McKinley referred to her as his partner and an owner of Queen Virgin Remy in the presence of Vendors.  <u>Id.</u>

Thomason's promissory estoppel claim also fails for lack of justifiable reliance.  Promissory estoppel is an equitable doctrine, and as such requires reasonable reliance on a promise, meaning that "the plaintiff relied exclusively on such promise and not on his or her own preconceived intent or knowledge; that the plaintiff exercised due diligence, so as to justify such reliance as a matter of equity; and that there was nothing under the circumstances which would prevent the plaintiff from relying to his detriment." Simpson Consulting, Inc. v. Barclays Bank PLC, 227 Ga. App. 648, 656, 490 S.E.2d 184 (1997), overruled on other grounds, Williams General Corp. v. Stone, 279 Ga. 428, 614 S.E.2d 758 (2005); see also First Bank of Georgia v. Robertson Grading, Inc., 328 Ga. App. 236, 241-42, 761 S.E.2d 628 (2014).

The Court is puzzled by Thomason's reliance on Callaway v. Garner, 327 Ga. App. 67, 755 S.E.2d 526 (2014), opinion vacated in part by Callway v. Garner, 333 Ga. App. 747, 776 S.E.2d 829 (Mem.) (2015) and Turner Broadcasting System, Inc. v. McDavid, 303 Ga. App. 593, 693 S.E.2d 783 (2010).  Both cases are breach of contract claims and not promissory estoppel cases.  The question here is not whether oral promises are enforceable.  It is axiomatic that they are under certain circumstances.  The question on promissory estoppel is whether it is reasonable under the circumstances for a person to rely on a promise that does not meet the requirements of a contract.  The Court finds here that it is not reasonable.

For these reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment as to Plaintiffs' claims of breach of contract and promissory estoppel.

### D.   Fraud

In its order on Plaintiffs' motion to dismiss counterclaims, the Court found that Thomason had not alleged fraud with the specificity required under Federal Rule of Civil Procedure 9(b).   Thomason amended her fraud claims.   See Am. Counterclaim, Doc. No. [77].   Her new allegations are:

- McKinley "misrepresented . . . on multiple occasions during their discussion of their partnership terms that he and Ms. Thomason were co-owners of the Queen Virgin Remy business." (¶ 74)

- Both while meeting in Atlanta and during telephone conversations regarding their proposed partnership, McKinley misrepresented to Thomason on multiple occasions that:

    - if Ms. Thomason would put up to $100,000 in the business, then she and McKinley would be 50-50 partners;

    - McKinley would find a live-work space and if Ms. Thomason would pay for that, and to get a web design for online sales, to get a retail storefront open and the other expenses that would be a part of the business start-up, then they would be 50-50 partners;

    - McKinley would set up a limited liability entity in which they were each 50% owners;

    - Each subsequent location would also be owned by them jointly as fifty-fifty partners (¶ 78); and

    - Ms. Thomason and McKinley would equally share the Queen Virgin Remy profits. (¶ 75 and ¶ 79)

33

- McKinley "misrepresented on multiple occasions that he and Ms. Thomason were co-owners and business partners for the Queen Virgin Remy business . . . [and] in Ms. Thomason's presence, he represented to others that she was an owner and partner in the business. (¶ 76), and

- In response to a question from Thomason, McKinley stated that he had completed the paperwork for the two of them to be 50-50 partners. (¶ 77)

Thomason also alleges that McKinley failed to disclose to her that (1) he had not organized Queen Virgin Remy as a Georgia limited liability company with 50-50 ownership by Thomason and McKinley; (2) he had not organized the subsequent Queen Virgin Remy entities as 50-50 partnerships; and (3) the intellectual property related to Queen Virgin Remy was not owned solely by Queen Virgin Remy.  Id., ¶ 80.  Thomason alleges that she relied on these misrepresentations by making a substantial investment in the Queen Virgin Remy entities, making significant entrepreneurial efforts to develop and grow the business; and working substantial hours for the business.  Id., ¶ 82.

Plaintiffs argue that these allegations are not sufficient to support a fraud claim because they are the same as Thomason's breach of (partnership) contract claim and because the alleged statements relate to future events.  Thomason responds that her claim is not barred as "future events" because McKinley's alleged promises to make her a partner related to the present state of their relationship and not to some future relationship.

34

To allege a viable fraud claim under Georgia law, Thomason must prove (1) a misrepresentation of material fact; (2) knowledge that the information was false (scienter); (3) an intention to induce Thomason to act or to refrain from acting; (4) justifiable reliance by Thomason; and (5) damage to Thomason. Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1288 (11th Cir.2007). "The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise any breach of a contract would amount to fraud." Hamilton v. Advance Leasing & Rent–A–Car, Inc., 208 Ga. App. 848, 850, 432 S.E.2d 559, 561 (1993).

The majority of claims raised by Thomason in her amended fraud allegations relate to the same facts alleged in her breach of (partnership) contract claims. To the extent they are the same, the Court finds they are prohibited by Georgia law which bars bringing a breach of contract claim in the guise of a fraud claim. Furthermore, the Court already determined above with respect to Thomason's promissory estoppel claim that she cannot show justifiable reliance on any promise made by McKinley. For the same reason, no reasonable jury could determine that Thomason presented sufficient evidence to show reasonable reliance in her fraud claim. The Court **GRANTS** Plaintiffs' motion for summary judgment as to Thomason's fraud claim.

35

E.     **Breach of Fiduciary Duty**

In its previous order, the Court stated that "[a]lthough it is a close question, the Court finds that on a motion to dismiss, Ms. Thomason has sufficiently alleged a confidential relationship between her and McKinley such that she came to trust him in financial matters." <u>See</u> Doc. No. [68], at pp. 14-15. "If Ms. Thomason can establish the requisite confidential relationship, her allegations would address fiduciary duties outside the scope of the alleged partnership agreement." <u>Id.</u> at 15.

In her Amended Counterclaim, Thomason avers only that "McKinley breached his fiduciary duties by, *inter alia* breaching his agreement that [he] and Plaintiff-in-Counterclaim would be equal partners in the QVR business and by concealing material facts that he had a duty to disclose to Plaintiff-in-Counterclaim." <u>See</u> Am. Counterclaim, Doc. No. [77], ¶ 86.

In their motion for summary judgment, Plaintiffs contend that because there was no partnership agreement, Thomason cannot carry a claim of breach of fiduciary duty based on matters related to the partnership. Plaintiffs further note that Thomason testified that she no longer trusted McKinley with respect to personal matters as early as September 2012, and therefore she cannot allege a confidential relationship as to matters outside the partnership agreement.

36

In Georgia, "fiduciary duties and obligations are owed by those in confidential relationships." Atlanta Market Center Mgmt. Co. v. McLane, 269 Ga. 604, 606, 503 S.E.2d 278 (1998). Section 23-2-58 of the O.C.G.A. defines a confidential relationship as "[a]ny relationship . . . where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." Id.

Under Georgia law, a fiduciary relationship may arise by law, contract, or the facts of a particular case. Douglas v. Bigley, 278 Ga. App. 117, 120, 628 S.E.2d 199 (2006) (finding a possible confidential relationship between a woman and her neighbor in whose company she invested). "[M]ost business relationships [however] are not generally confidential or fiduciary relationships." Newitt v. First Union Nat. Bank, 270 Ga. App. 538, 546-47, 607 S.E.2d 188 (2004).

> Where parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests. A fiduciary relationship arises only "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."

Id. See also Moore v. Bank of Fitzgerald, 225 Ga. App. 122, 483 S.E.2d 135 (1997) ("The mere fact that one reposes trust and confidence in another does not create a confidential relationship. In the majority of business dealings, opposite parties have

trust and confidence in each other's integrity, but there is no confidential relationship by this alone.").

The Court finds that by the terms of her own allegations, in her Amended Counterclaim, Thomason raises a breach of fiduciary duty claim only with respect to the alleged agreement to be equal partners. See Doc. No. [77], ¶ 86. Although Thomason uses the term "inter alia" in Paragraph 86, she never specifies in her breach of fiduciary duty claim any other breaches committed by McKinley. The Court has already held that she cannot claim a breach of fiduciary duty as to matters within the scope of the partnership. Thomason admits that she did not trust McKinley on matters outside of the business relationship. See Thomason Depo., at 78-79 ("I never trusted him in the personal relationship because he was still seeing several women."). Because Thomason admits that she did not trust McKinley in matters outside the business relationship and the partnership allegations cannot form the basis of her breach of fiduciary duty claim, the Court **GRANTS** Plaintiffs' motion for summary judgment as to Thomason's breach of fiduciary duty claim.

### F.    Conversion

Plaintiffs allege that on February 19, 2015, Thomason took $5,900 worth of hair inventory from the Columbus, location of Queen Virgin Remy without paying. See PSMUF, ¶ 76. Thomason was arrested by the Columbus Police Department on

38

the charge of theft by shoplifting in violation of O.C.G.A. § 16-8-14.  Id., ¶ 77.
Plaintiffs assert that Thomason did not have title in the inventory because she did
not have any ownership interest in Queen Virgin Remy. Id., ¶ 78.  Thomason never
returned the hair to Queen Virgin Remy Columbus.  Id., ¶ 81.

Thomason responds that Queen Virgin Remy had agreed to be a sponsor at
the Bronner Brothers hair industry trade show. See Resp. PSMUF, ¶ 76.  Thomason
took the hair as part of this sponsorship activity and Plaintiffs were aware of that.
Id.

Georgia law defines conversion as "an unauthorized assumption and exercise
of the right of ownership over personal property belonging to another, in hostility
to his rights; an act of dominion over the personal property of another inconsistent
with his rights; or an unauthorized appropriation." Williams v. Nat'l Auto Sales,
Inc., 287 Ga. App. 283, 285, 651 S.E.2d 194, 196 (2007) (quoting Corbin v. Regions
Bank, 258 Ga. App. 490, 495, 574 S.E.2d 616, 621 (2002)).  "To make out a prima facie
case, in an action for damages for conversion of personal property, the plaintiff
must show title to the property, possession by the defendant, demand for
possession, and refusal to surrender the property." Taylor v. Powertel, Inc., 250 Ga.
App. 356, 358, 551 S.E.2d 765, 769 (2001) (internal quotations omitted).  "Any
distinct act of dominion and control wrongfully asserted over another's personal
property, in denial of his right or inconsistent with his right, is a conversion of such

39

property." Id. "However, when someone comes into lawful possession of personal property, in the absence of a demand for its return and a refusal to return the personal property, there is no conversion." Id.

The Court finds that under the circumstances presented here, there is a jury question as to whether Thomason is liable for conversion.  While the Court may have determined that Thomason could not establish her partnership claim, that is not the only way in which Thomason asserts she had authority to assume control over this inventory.  Thomason testified that McKinley was aware of the fact that she was taking the inventory to the Bronner Brothers trade show.  McKinley disputes this, but if the jury credits Thomason's testimony, then there is no basis for a conversion claim because Thomason's assumption of control over this inventory would be authorized.

As such, the Court **DENIES** Plaintiffs' motion for summary judgment as to their conversion claim.

### G.    Tortious Interference with Business Relationship

Queen Virgin Remy has a contractual relationship with Toya Wright and her company Beautiful Bosses concerning the Toya Wright Hair Collection.  See PSMUF, ¶ 89.  McKinley included Thomason on emails and documents exchanged during the formation, set up, and rollout of the Toya Wright product line.  See DSMUF, ¶¶ 11, 13.  McKinley also directed Toya Wright to contact Thomason if she

40

had any questions about the Queen Virgin Remy/Toya Wright partnership proposal. Id., ¶ 12. Thomason attended the prelaunch of the Toya Wright product line in New Orleans in July 2013 and the official launch at the Bronner Brothers Atlanta show in August 2013. Id., ¶ 14. McKinley did not attend either function. Id. McKinley testified that Thomason told Wright that McKinley was stealing from her and that Queen Virgin Remy's relationship with Toya Wright suffered causing financial damages to Queen Virgin Remy. See PSMUF, ¶¶ 91-92. Thomason disputes this. Id., Def.'s Resp., ¶ 91.

In Georgia, to establish a claim of tortious interference with contractual relations, a plaintiff must show "the existence of a valid contract and that the defendant acted intentionally, without privilege or legal justification, to induce another not to enter into or continue a business relationship with the plaintiff, thereby causing the plaintiff financial injury." Atlanta Market Center Management Co. v. McLane, 269 Ga. 604, 608 (1998). A plaintiff must also show that the defendant is a "stranger" to the "contract at issue and the business relationship giving rise to and underpinning the contract." Id. at 610. Similarly, to establish a claim of tortious interference with business relations, a plaintiff must show that the defendant was a "stranger" to the business relationship underpinning the claim. See Cox v. City of Atlanta, 266 Ga. App. 329, 596 S.E.2d 785 (2004).

In <u>LaSonde v. Chase Mortgage Co.</u>, 259 Ga. App. 772 (2003), a buyer filed suit against a seller and a mortgage company alleging that the mortgage company interfered with the buyer's contractual relationship with the seller to purchase his house. <u>Id.</u> at 772. The Court of Appeals reiterated the teachings of <u>Atlanta Market</u> and further stated that "[o]ne is not a stranger to the contract just because he is not a party to the contract." <u>Id.</u> at 773. "A person with a direct economic interest in the contract is not a stranger to the contract." <u>Id.</u> The court found the mortgage company was not a stranger to the purchase contract because it had a direct economic interest in the property that was the subject of the contract. <u>Id.</u> at 774.

Here, there is no dispute that as an employee of Queen Virgin Remy, Thomason had an economic interest in the contract between Queen Virgin Remy and Toya Wright. Furthermore, there is no dispute that McKinley included Thomason on discussions with Toya Wright and depended on Thomason to manage the relationship between Queen Virgin Remy and Toya Wright. As such, the Court cannot conclude that Thomason is a "stranger" to the relationship between Toya Wright and Quen Virgin Remy.

As such, the Court **DENIES** Plaintiffs' motion for summary judgment in favor of their tortious interference claim. The Court further finds as a matter of law that Plaintiffs' tortious interference claim cannot stand.

### H.   Defamation

McKinley contends that Thomason is liable for libel because she authored a post on her Instagram account stating that McKinley was a liar in his Queen Virgin Remy business dealings, stole from Thomason, misappropriated Queen Virgin Remy company funds for his personal use, and committed perjury by lying under oath.  See PSMUF, ¶ 93.  Thomason contends that the statements are truthful.  See Resp. PSUMF, ¶ 46.  She also contends that the statements were made in good faith due to her interests in the matter as an alleged part-owner of Queen Virgin Remy. Id., ¶ 54.

"A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1. A written defamatory statement is actionable as either libel per se or libel per quod.  Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality. Statements that tend to injure one in his trade or business also are libelous per se. Zarach v. Atlanta Claims Association, 231 Ga. App. 685, 500 S.E.2d 1 (1998).  A plaintiff does not need to show malice when the libel is actionable per se.  Van Gundy v. Wilson, 84 Ga. App. 429, 429-30, 66 S.E.2d 93 (1951).

"[S]tatements are privileged if they are made with a good faith intent by the speaker to protect his interest in a matter in which he is concerned.  A defendant

relying on privilege as a defense to a libel action must show good faith, an interest to be upheld, a statement properly limited in scope, a proper occasion and publication to proper persons." Davis v. Sherwin-Williams, Co., 242 Ga. App. 907, 908 (2000). A privilege may be overcome by a showing of actual malice. Id. at 908-09.

The Court finds there is a material dispute of fact as to whether the statements made by Thomason were truthful and whether Thomason was privileged to make such statements. See, e.g., Community Newspaper Holdings, Inc. v. King, 299 Ga. App. 267, 682 S.E.2d 346 (2009). The Court **DENIES** Plaintiff McKinley's motion for summary judgment on his defamation claim.

## I.     Intellectual Property

Plaintiffs contend that Thomason has infringed their intellectual property rights both by using the Queen Virgin Remy name and mark without authorization and by forming a competing business with the similar name and logo, Royal Virgin Remy. Thomason defends, in part, by asserting that the Queen Virgin Remy registration is void because McKinley, who filed the registration, was not the owner of the Queen Virgin Remy marks at the time of registration, but rather Queen Virgin Remy, the corporation, owned the marks.

Plaintiffs file a motion to strike Defendant's theory of invalidity for failure to disclose it in her initial disclosures or during discovery. See Doc. No. [147].

44

Defendant responds that ownership of the trademark at issue is a prima facie element of Plaintiffs' trademark infringement claim and regardless of Defendant's actions, Plaintiffs cannot be relieved of the requirement of proof on that element, nor can Plaintiffs claim surprise that they must prove ownership.  See Doc. No. [161]. Further, Defendant contends, Plaintiffs responded to Defendant's ownership argument and briefed it without mention, thereby waiving any objection they might have.  Id.

Under the circumstances presented in this case, the Court agrees that ownership is an element that Plaintiffs must always show.  As such, the legal question of whether the registration was made in the proper name is a matter that must be addressed regardless of whether Defendant specifically raise it as a defense.  For the foregoing reasons, the Court **DENIES** Plaintiffs' motion to strike Defendant's theory of defense [147].[8]

Plaintiffs' intellectual property claims surround the Queen Virgin Remy trademark and the "Come Get Your Weave Girl" slogan.  Plaintiffs' intellectual property claims are premised on their contention that Thomason has no ownership interest in the intellectual property of Queen Virgin Remy because she is not a partner in the Queen Virgin Remy business entity.  Plaintiffs also aver that after

---

[8] The Court **GRANTS** Plaintiffs' unopposed motion to extension of time to file reply [169].

45

2014, McKinley did not authorize Thomason to use the Queen Virgin Remy name and marks, yet Thomason has held herself out to be an owner of Queen Virgin Remy in various social media postings.

Plaintiffs also contend that Thomason's use of the Royal Virgin Remy name and mark infringes on their Queen Virgin Remy intellectual property.  In November 2015, Thomason registered a website, royalvirginremy.com and created a social media presence surrounding that name.  Thomason is using similar sales and advertising channels to promote her alleged "Royal Virgin Remy" marks, including Instagram, online sales, and a potential store in Atlanta.  See PSMUF, ¶ 86.  Amber King, former Queen Virgin Remy employee, testified that in December 2015, Thomason invited King to "follow" Royal Virgin Remy on Instagram.  See King Decl., ¶ 11.  When King saw the Royal Virgin Remy logo, she believed that the product was affiliated with McKinley and Queen Virgin Remy.  Id., ¶ 12.  King asked McKinley about it and he said he knew nothing.  Id.  Thomason then sent the logo to King in a text with the accompanying message: "U know this is me right." Id., ¶ 14.  Thomason was upset with King because King had contacted McKinley about the logo.  Id., ¶ 15.  Thomason did not want McKinley to know about it.  Id., ¶ 16.

Thomason also exchanged text messages with her daughter in which Thomason shared a mock-up of an ad for Royal Virgin Remy.  Thomason's

46

daughter pointed out that Thomason had left the Queen Virgin Remy logo in the corner of the ad.  Thomason responded: "Omg I just noticed.  It lord.  Man U saved me.  He gonna be mad about those pics."  See Doc. No. [143], Ex. B.

Thomason argues that Plaintiffs' intellectual property claims fail because: (1) McKinley was not the owner of the mark when he registered it, (2) Thomason has never used the mark in commerce, (3) Thomason's use of the mark is protected by the "fair use" doctrine, and (4) Plaintiffs have provided no evidence of consumer confusion.

The Lanham Act "protects trademark owners from infringement and unfair competition by 'prohibiting the use in interstate commerce of any word, term, name, symbol or device, . . . or any false designation of origin . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.'" Suntree Technologies, Inc. v. Ecosense Intern., Inc., 693 F.3d 1338, 1344-45 (11th Cir. 2012).  To prevail on a federal claim of trademark infringement or unfair competition, a trademark owner must show (1) that it "had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two." Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647-48 (11th Cir. 2007); see also Crystal Entertainment & Filmworks, Inc. v.

Jurado, 643 F.3d 1313, 1321 (11th Cir. 2011); Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010).

A direct trademark infringement action is brought pursuant to Section 32 of the Lanham Act. Under the circumstances presented here, Plaintiffs must show that Thomason used the Queen Virgin Remy mark without McKinley's consent and thus her use was unauthorized and likely to cause confusion. See, e.g., McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1988). Further, Plaintiffs may contend that Thomason's use of the Royal Virgin Remy name and logo is so similar to the Queen Virgin Remy mark that it is likely to cause confusion.

In the alternative, Plaintiffs can bring an unfair competition claim under a Section 43(a) to show that even without actual registration, the Queen Virgin Remy name and logo are entitled to protection. Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010). A federal cause of action for unfair competition exists "even in the absence of federal trademark registration," University of Florida v. KPB, Inc., 89 F.3d 773, 776 (11th Cir. 1996); Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V., 69 F. Supp. 3d 175, 201 (D.D.C. 2014) ("Whereas federal registration of a mark is prima facie evidence that the registrant owns the mark and has the exclusive right to use the mark on the goods and services specified in the registration, see 15 U.S.C. § 1057(b), an unregistered mark is protectable under

48

Section 43 of the Lanham Act only if a separate showing is made that it would qualify for registration as a trademark.").

The Eleventh Circuit applies a seven-factor test for determining whether a likelihood of consumer confusion exists: (1) type of mark, (2) similarity of mark, (3) similarity of products or services the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media, (6) defendant's intent, and (7) actual confusion. Frehling Enters., Inc. v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). A court should not engage in a "mechanistic summation" of the factors. See Custom Mfg. & Eng'g, Inc. v. Midway Srvs., Inc., 508 F.3d 641, 649 (11th Cir. 2007). The type of mark and the evidence of actual confusion are to be given the most weight. Id. at 650. A plaintiff is not required to demonstrate actual confusion to sustain a claim under the Lanham Act. See E. Remy Martin & Co. v. Shaw-Ross International Importers, Inc., 756 F.2d 1525, 1529 (11th Cir. 1985) ("The law is well settled in this circuit that evidence of actual confusion . . . is not necessary to a finding of likelihood of confusion.") (emphasis in original).

Queen Virgin Remy sells premium hair products to individual buyers, salon chains, cosmetic/beauty distributors, and retailers. McKinley began selling hair under the Queen Virgin Remy brand in 2011. McKinley and Thomason met in 2012 when Thomason saw McKinley's ad for hair sales on Craigslist. McKinley is the

registrant and owner of Registered U.S. Trademark No. 4587540 for "Queen Virgin Remy" name and mark as used in reference to "services featuring human hair." The application was filed on October 3, 2013, and registered on August 19, 2014. See DSMUF, ¶ 23. QVR Ltd. applied for federal registration of the "Come Get Your Weave Girl" slogan on June 24, 2014. Id., ¶ 25.

There is no dispute that at the time McKinley filed the registration application in his own name, Queen Virgin Remy was the entity that owned the intellectual property. However, "courts may presume that a real person who owns all the stock of a corporation controls the corporation so that use of the mark by the corporation inures to the benefit of the real person, who is presumed to be the 'owner' of the mark." See, e.g., Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc., Civil Action No. 99-C-7778, 2003 WL 23144859, at *11 (N.D. Ill. Dec. 22, 2003). Here, as the Court determined above, Thomason has not presented sufficient evidence from which a jury could conclude that she has any ownership interest in Queen Virgin Remy. As such, McKinley is the only individual with any ownership interest and controls the Queen Virgin Remy corporation. The use of the mark inures to the benefit of McKinley and Queen Virgin Remy such that the fact that McKinley registered the mark and Queen Virgin Remy owns the mark is not a relevant distinction. Compare Smith v. Coahoma Chemical Co., 264 F.2d 916 (C.C.P.A. 1959) ("Smith testified that he was a 'principal' and 'controlling' stockholder, but the

actual percentage of stock owned by him was not shown. Certainly it has not been established that his ownership was so complete that he and the corporation equitably constituted a single entity."); <u>see</u> <u>also</u> 15 U.S.C. § 1127 (defining "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used").

For these reasons, the Court finds that McKinley's registration of the Queen Virgin Remy mark and name is not invalid by virtue of the fact the McKinley and not Queen Virgin Remy filed the application for registration.  In any event, even if the registrations were invalid, McKinley and Queen Virgin Remy could still pursue an infringement action under section 43(a) of the Lanham Act which protects unregistered trademarks. <u>See</u>, <u>e.g.</u>, <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992).  The Court now turns to the seven factor test for likelihood of confusion.

Thomason admits that the phrase "Queen Virgin Remy" and the Queen Virgin Remy design logo as original and inherently distinctive. <u>See</u> Cmplt., ¶ 80, ¶ 88; Answer, ¶ 80, ¶ 88; PSMUF, ¶ 61.  A comparison of the Queen Virgin Remy name and logo with the Royal Virgin Remy name and logo show they are almost identical.  Thomason argues that the words "Queen" or "Royal" or "Virgin" are not highly distinctive and therefore cannot be a source of confusion.  However, it is the

51

overall comparison between the Queen Virgin Remy name and logo with the Royal Virgin Remy name and logo.  Both have the cursive writing of the name "Virgin Remy" split by a shadowed silhouette of a crown (or a head with a crown) and the straight lettering beneath of "Virgin & Remy Hair Extensions" preceded either by "pure" or "exotic."  See, e.g., University of Georgia Athletic Association v. Laite, 756 F.2d 1535, 1544 (11th Cir. 1985) ("[I]t is the combination of similar . . . elements, rather than any individual element, that compels the conclusion that the two [marks] are similar."); Doc. No. [75], at 6 (depicting both names and logos).

Both relate to hair products and use similar sales and advertising channels through internet sales and social media such as Instagram.  Plaintiffs have presented evidence of actual confusion through Ms. King, a sophisticated individual in the hair industry who actually worked for Queen Virgin Remy and believed Royal Virgin Remy was associated with Queen Virgin Remy.  The Court would be hard-pressed to find more relevant evidence of the likelihood of confusion than the fact that a former employee of Queen Virgin Remy was confused by Thomason's Royal Virgin Remy mark and logo and thought it was affiliated with Queen Virgin Remy.  Thomason, herself, left part of the Queen Virgin Remy logo on an advertisement she was creating for Royal Virgin Remy.  Her daughter had to point out to Thomason that the Queen Virgin Remy logo remained.  Thomason's own statements to her daughter and Ms. King that McKinley would

be mad about the Royal Virgin Remy logo demonstrate her intent and understanding that the purpose of Royal Virgin Remy was to trade on and compete with Queen Virgin Remy.

In the face of this evidence, Thomason defends against Plaintiffs' claims by arguing that her usage of the Queen Virgin Remy name was not "in commerce." The Lanham Act defines "'used in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.  A mark is "deemed to be in use in commerce" for goods when:

> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, . . . and the person rendering the services is engaged in commerce in connection with the services.

Id.

In their response to Thomason's motion for partial summary judgment, Plaintiffs appear to focus on certain "uses" of the Queen Virgin Remy mark and name by Thomason:

• use of the Queen Virgin Remy brand logo on promotional flyers published through Thomason's social media accounts for an

industry event she was attending (Doc. No. [136], ¶¶ 71-72 (February 21, Bronner Brothers))

- use of the Queen Virgin Remy mark in marketing materials to promote networking events organized by Thomason (Doc. No. [136], ¶¶ 76-79, Exh. F (April 19, 2015 "Beyond the Chair: ATL" event, $35 per participant)

- Thomason's registration of the email accounts: queenvirginremybaltimore@gmail.com and queenvirginremychicago@gmail.com, and

- use of the Royal Virgin Remy name and logo to advertise her competing business.

See Doc. No. [143], at 10.

Instagram is a marketing tool used by many in the beauty industry.  See DSMUF, ¶ 15.  Thomason and other stylists have regularly tagged Queen Virgin Remy in Instagram with respect to a hairstyle or hair that they have used.  See DSMUF, ¶ 19.  Thomason admitted that she uses her "@hairbyaoki" Instagram account to "market and promote herself professionally to members of the public and social media followers, including existing and/or potential hair weave and extensions customers, salons, and stylists." See Doc. No. [136], First Am. Cmplt., ¶¶

58-59.[9]   Plaintiffs seek relief on posts made by Thomason after 2014 and as referenced in Plaintiffs' complaint. See DSMUF, ¶¶ 27-28.

Thomason argues, for example, that the Bronner Brothers posted does not constitute "use" because it does not connect Queen Virgin Remy, as a sponsor, with any goods or services, does not affix the Queen Virgin Remy name to any goods, does not constitute a "call to action" regarding the purchase of goods or services, does not evidence Thomason's promotion of herself commercially, and does not contain a statement that she is a partner of Queen Virgin Remy. See Doc. No. [156], at 6. Thomason's argument improperly conflates several concepts. As an initial matter, Plaintiffs' theory of infringement is that Thomason's use of the Queen Virgin Remy name and mark for the purposes of promoting her business creates the false impression that the use is with the approval of Queen Virgin Remy. Simply put, Plaintiffs argue that Thomason used the Queen Virgin Remy name without authorization. Traveling under this theory, Plaintiffs are not required to show that Thomason specifically alleged she as a partner in Queen Virgin Remy. Obviously, the poster does not "affix" the Queen Virgin Remy name to any hair goods. But Plaintiffs' theory, again, is that Thomason using the terms in connection with the

---

[9]Thomason contests that these citations do not contain any admission regarding the use of the Queen Virgin Remy or Royal Virgin Remy mark. Of course, Plaintiffs' purpose in pointing to these admissions is to show that Thomason agrees that social media outlets can be used to promote the services of a hair stylist.

provision of goods and services.  Clearly, the poster is a use in commerce because it constitutes advertising of a service.  This is the purpose of paying to be a sponsor of the Bronner Brothers hair show.  Thomason's contention that she is not advertising her services circles back to the argument that all Plaintiffs need to show is that the use of the Queen Virgin Remy mark was without authorization, not that Thomason was attempting to advertise her own styling.  Thomason, herself, testified that she started the Royal Virgin Remy company so as to sell and style hair. See Doc. No. [130], Thomason Depo., at 55-66.  Thomason planned a January 2016 launch of this business but delayed the launch due to the instant litigation.  Thus, it is without dispute that Thomason's use of Royal Virgin Remy is "in commerce."

Thomason also argues that any use of the term "Queen Virgin Remy" in her Instagram postings constitutes "fair use."  "A fair-use defense is established if a defendant proves that its use is: '(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." International Stamp Art, Inc. v. U.S. Postal Service, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing 15 U.S.C. § 1115(b)(4)).  "The 'fair-use' defense, in essence, forbids a trademark registrants to appropriate a descriptive term for [its] exclusive use and so prevent others from accurately describing a characteristic of their goods." Id.  A defendant raising the affirmative defense of "fair-use" does not have the burden of showing confusion unlikely because "some possibility of consumer confusion" is "compatible with fair use." See KP Permanent Make-Up,

56

Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 121-24 (2004).  The Eleventh Circuit

has concluded that the standard for "good faith" is "whether the alleged infringer

intended to trade on the good will of the trademark owner by creating confusion

as to the source of the goods or services." International Stamp Art, 456 F.3d at 1274.

Thomason also relies on the "nominative fair use" doctrine which was first

adopted by the Ninth Circuit in New Kids on the Block v. News Am. Pub., Inc., 971

F.2d 302,  308 (9th Cir. 1992), to address a  situation where the defendant contended

it used a mark as a reference to describe the other product or compare it to its own.

In Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211 (3d Cir 2005), the

Third Circuit modified the test to ask whether (1) use of plaintiff's mark is necessary

to describe plaintiff's or defendant's product or service, (2) whether defendant has

used more of the mark than necessary, and (3) whether "defendant's conduct or

language reflect[s] the true and accurate relationship between plaintiff and

defendant's products or services." Id. at 232.

Thomason states that her #queenvirginremy notations on Instagram shows

only that this is the hair product she has used in the hair styling depicted in the

photo.  While this might be true for some of the postings cited by Plaintiffs, see Exs.

Q1, Q2, Q3, Q4, Q5, Q6, Q7, Q8, Q9, Q10, even Thomason admits that there are

other posts which involve commercial use.  See Doc. No. [156], Thomason's Reply,

at 15 (contending court should not consider "very limited set of posts which

arguably might be deemed to involve some kind of commercial use" because Plaintiffs cannot show valid registration or likelihood of confusion). The Court's review of the exhibits proffered by Plaintiffs also show Thomason's use of the Queen Virgin Remy name in a manner which is intended to imply ownership of the enterprise and not simply fair use of the name of the hair product. See, e.g., Ex. F (Instagram post showing not only #queenvirginremy but also linking to the website); Ex. H (using #queenvirginremy to promote her networking event); Ex. Q11, and Ex. Q12. As such, the Court finds that at least with respect to some of Thomason's postings, Plaintiffs have demonstrated the required elements of trademark infringement.

Significantly, Plaintiffs do not seek compensatory damages. The Court understands this position given the circumstances of the litigation. The parties engaged in this litigation to determine who had ownership rights of the Queen Virgin Remy intellectual property. The damage done by Thomason's use of the Queen Virgin Remy name is the implication that it is she who owns the company. Given how quickly litigation developed, the monetary damage is likely not significant. More important to the parties is a determination as to who may use the name going forward. Similarly, Thomason's development of the Royal Virgin Remy name, logo, and business plan is likely not to have yet caused significant damage to the Queen Virgin Remy mark because Thomason was advised to put the

Royal Virgin Remy plans on hold while this litigation was pending.  Rather, Plaintiffs' interest is geared toward demonstrating that the Royal Virgin Remy name and mark infringes the Queen Virgin Remy name and mark and Thomason should not be permitted to use it going forward.[10]

Plaintiffs also bring related state law trademark and unfair competition claims.  It is clear that "[c]ourts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." Planetary Motion, inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001); see also Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010); Natural Answers, Inc. v. SmithKline Beecham, Corp., 529 F.3d 1325, 1332-33 (11th Cir. 2008); Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1205 n.1 (11th Cir. 2008).  To the extent Plaintiffs' federal trademark claims survive, so do their related state law claims.

Given that the Court has determined Thomason does not have sufficient evidence from which a reasonable jury could conclude that she is a partner in the Queen Virgin Remy business, the Court further finds that any use by Thomason of the Queen Virgin Remy marks beyond "fair use" is unauthorized and improper.

---

[10]The Court notes that this analysis closely tracks the Court's interpretation of the evidence presented at the Court's October 25, 2015 hearing. See Doc. No. [47] Order granting Plaintiffs' motion to modify injunction and denying Plaintiffs' motion for sanctions.

Further, the Court has found the Royal Virgin Remy name and logo infringes upon the intellectual property rights of Queen Virgin Remy. The Court now makes permanent the preliminary injunction it entered on June 10, 2015, <u>see</u> Doc. No. [14], and modified on October 21, 2015, <u>see</u> Doc. No. [47].

The Court **ORDERS** that Defendant henceforth will discontinue all unauthorized uses (whether by herself or by persons acting upon her instructions) of the "Queen Virgin Remy" mark, and the "Virgin Remy, Exotic Virgin & Remy Hair Extensions" logo, as well as the "Come Get Your Weave Girl" slogan.

The Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment [122] and **DENIES** Defendant's motion for summary judgment [123].

## III.   Conclusion

The Court **DENIES AS MOOT** Plaintiffs' motion for order to show cause why Defendant Thomason should not be held in contempt [75]; **DENIES AS MOOT** Plaintiffs' motion for temporary restraining order and request for preliminary injunction [76]; **DENIES AS MOOT** Plaintiffs' motion to dismiss Defendant's amended counterclaim [84]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file matters under seal [121]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment [122]; **DENIES** Defendant's motion for summary judgment [123]; **GRANTS IN**

**PART AND DENIES IN PART** Defendant's motion for leave to file materials under seal [127]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file matters under seal [135]; **DENIES** Plaintiffs' motion to strike Defendant's theory of defense [147]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file material sunder seal [148]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file material under seal [149]; **GRANTS** Plaintiffs' motion to amend citations [154]; Plaintiffs' motion for attorney's fees [159]; **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for leave to file material under seal [160]; and **GRANTS** Plaintiffs' unopposed motion for extension of time to file reply [169].

The Court **ORDERS** that Defendant henceforth will discontinue all unauthorized uses (whether by herself or by persons acting upon her instructions) of the "Queen Virgin Remy" mark, and the "Virgin Remy, Exotic Virgin & Remy Hair Extensions" logo, as well as the "Come Get Your Weave Girl" slogan.

The Court **DIRECTS** the parties to file a pre-trial order on Plaintiffs' remaining claims of conversion, defamation, and attorney's fees within thirty (30) days of the date of entry of this order.

**IT IS SO ORDERED** this 11th day of August 2016.

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

61

62